(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DAIMLER AG *v.* BAUMAN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 11–965.   Argued October 15, 2013—Decided January 14, 2014

Plaintiffs (respondents here) are twenty-two residents of Argentina who filed suit in California Federal District Court, naming as a defendant DaimlerChrysler Aktiengesellschaft (Daimler), a German public stock company that is the predecessor to petitioner Daimler AG. Their complaint alleges that Mercedes-Benz Argentina (MB Argentina), an Argentinian subsidiary of Daimler, collaborated with state security forces during Argentina's 1976–1983 "Dirty War" to kidnap, detain, torture, and kill certain MB Argentina workers, among them, plaintiffs or persons closely related to plaintiffs. Based on those allegations, plaintiffs asserted claims under the Alien Tort Statute and the Torture Victim Protection Act of 1991, as well as under California and Argentina law. Personal jurisdiction over Daimler was predicated on the California contacts of Mercedes-Benz USA, LLC (MBUSA), another Daimler subsidiary, one incorporated in Delaware with its principal place of business in New Jersey. MBUSA distributes Daimler-manufactured vehicles to independent dealerships throughout the United States, including California. Daimler moved to dismiss the action for want of personal jurisdiction. Opposing that motion, plaintiffs argued that jurisdiction over Daimler could be founded on the California contacts of MBUSA. The District Court granted Daimler's motion to dismiss. Reversing the District Court's judgment, the Ninth Circuit held that MBUSA, which it assumed to fall within the California courts' all-purpose jurisdiction, was Daimler's "agent" for jurisdictional purposes, so that Daimler, too, should generally be answerable to suit in that State.

*Held*: Daimler is not amenable to suit in California for injuries allegedly caused by conduct of MB Argentina that took place entirely outside the United States. Pp. 6–24.

Syllabus

(a) California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U. S. Constitution. Thus, the inquiry here is whether the Ninth Circuit's holding comports with the limits imposed by federal due process. See Fed. Rule Civ. Proc. 4(k)(1)(A). P. 6.

(b) For a time, this Court held that a tribunal's jurisdiction over persons was necessarily limited by the geographic bounds of the forum. See *Pennoyer* v. *Neff*, 95 U. S. 714. That rigidly territorial focus eventually yielded to a less wooden understanding, exemplified by the Court's pathmarking decision in *International Shoe Co.* v. *Washington*, 326 U. S. 310. *International Shoe* presaged the recognition of two personal jurisdiction categories: One category, today called "specific jurisdiction," see *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. ___, ___, encompasses cases in which the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum," *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 414, n. 8. *International Shoe* distinguished exercises of specific, case-based jurisdiction from a category today known as "general jurisdiction," exercisable when a foreign corporation's "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." 326 U. S., at 318.

Since *International Shoe*, "specific jurisdiction has become the centerpiece of modern jurisdiction theory." *Goodyear*, 564 U. S., at ___. This Court's general jurisdiction opinions, in contrast, have been few. See *Perkins* v. *Benguet Consol. Mining Co.,* 342 U. S. 437, *Helicopteros,* 466 U. S., at 416, and *Goodyear*, 564 U. S., at ___. As is evident from these post-*International Shoe* decisions, while specific jurisdiction has been cut loose from *Pennoyer*'s sway, general jurisdiction has not been stretched beyond limits traditionally recognized. Pp. 6–14.

(c) Even assuming, for purposes of this decision, that MBUSA qualifies as at home in California, Daimler's affiliations with California are not sufficient to subject it to the general jurisdiction of that State's courts. Pp. 14–23.

(1) Whatever role agency theory might play in the context of general jurisdiction, the Court of Appeals' analysis in this case cannot be sustained. The Ninth Circuit's agency determination rested primarily on its observation that MBUSA's services were "important" to Daimler, as gauged by Daimler's hypothetical readiness to perform those services itself if MBUSA did not exist. But if "importan[ce]" in this sense were sufficient to justify jurisdictional attribution, foreign corporations would be amenable to suit on any or all claims wherever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the "sprawling view of general jurisdiction" re-

jected in *Goodyear*. 564 U. S., at ___. Pp. 15–17.

    (2) Even assuming that MBUSA is at home in California and that MBUSA's contacts are imputable to Daimler, there would still be no basis to subject Daimler to general jurisdiction in California. The paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business. *Goodyear,* 564 U. S., at ___. Plaintiffs' reasoning, however, would reach well beyond these exemplar bases to approve the exercise of general jurisdiction in every State in which a corporation "engages in a substantial, continuous, and systematic course of business." Brief for Respondents 16–17, and nn. 7–8. The words "continuous and systematic," plaintiffs and the Court of Appeals overlooked, were used in *International Shoe* to describe situations in which the exercise of *specific* jurisdiction would be appropriate. See 326 U. S., at 317. With respect to all-purpose jurisdiction, *International Shoe* spoke instead of "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit . . . on causes of action arising from dealings entirely distinct from those activities." *Id.,* at 318. Accordingly, the proper inquiry, this Court has explained, is whether a foreign corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear,* 564 U. S., at ___.

    Neither Daimler nor MBUSA is incorporated in California, nor does either entity have its principal place of business there. If Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA's sales are sizable. No decision of this Court sanctions a view of general jurisdiction so grasping. The Ninth Circuit, therefore, had no warrant to conclude that Daimler, even with MBUSA's contacts attributed to it, was at home in California, and hence subject to suit there on claims by foreign plaintiffs having nothing to do with anything that occurred or had its principal impact in California. Pp. 18–21.

    (3) Finally, the transnational context of this dispute bears attention. This Court's recent precedents have rendered infirm plaintiffs' Alien Tort Statute and Torture Victim Protection Act claims. See *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. ___, ___, and *Mohamad* v. *Palestinian Authority*, 566 U. S. ___, ___. The Ninth Circuit, moreover, paid little heed to the risks to international comity posed by its expansive view of general jurisdiction. Pp. 22–23.

644 F. 3d 909, reversed.

    GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, ALITO, and KAGAN, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–965

_____

## DAIMLER AG, PETITIONER *v.* BARBARA BAUMAN ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 14, 2014]

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the authority of a court in the United States to entertain a claim brought by foreign plaintiffs against a foreign defendant based on events occurring entirely outside the United States. The litigation commenced in 2004, when twenty-two Argentinian residents[1] filed a complaint in the United States District Court for the Northern District of California against DaimlerChrysler Aktiengesellschaft (Daimler),[2] a German public stock company, headquartered in Stuttgart, that manufactures Mercedes-Benz vehicles in Germany. The complaint alleged that during Argentina's 1976–1983 "Dirty War," Daimler's Argentinian subsidiary, Mercedes-Benz Argentina (MB Argentina) collaborated with state security forces to kidnap, detain, torture, and kill certain MB

_____

[1] One plaintiff is a resident of Argentina and a citizen of Chile; all other plaintiffs are residents and citizens of Argentina.

[2] Daimler was restructured in 2007 and is now known as Daimler AG. No party contends that any postsuit corporate reorganization bears on our disposition of this case. This opinion refers to members of the Daimler corporate family by the names current at the time plaintiffs filed suit.

Argentina workers, among them, plaintiffs or persons closely related to plaintiffs. Damages for the alleged human-rights violations were sought from Daimler under the laws of the United States, California, and Argentina. Jurisdiction over the lawsuit was predicated on the California contacts of Mercedes-Benz USA, LLC (MBUSA), a subsidiary of Daimler incorporated in Delaware with its principal place of business in New Jersey. MBUSA distributes Daimler-manufactured vehicles to independent dealerships throughout the United States, including California.

The question presented is whether the Due Process Clause of the Fourteenth Amendment precludes the District Court from exercising jurisdiction over Daimler in this case, given the absence of any California connection to the atrocities, perpetrators, or victims described in the complaint. Plaintiffs invoked the court's general or all-purpose jurisdiction. California, they urge, is a place where Daimler may be sued on any and all claims against it, wherever in the world the claims may arise. For example, as plaintiffs' counsel affirmed, under the proffered jurisdictional theory, if a Daimler-manufactured vehicle overturned in Poland, injuring a Polish driver and passenger, the injured parties could maintain a design defect suit in California. See Tr. of Oral Arg. 28–29. Exercises of personal jurisdiction so exorbitant, we hold, are barred by due process constraints on the assertion of adjudicatory authority.

In *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. ___ (2011), we addressed the distinction between general or all-purpose jurisdiction, and specific or conduct-linked jurisdiction. As to the former, we held that a court may assert jurisdiction over a foreign corporation "to hear any and all claims against [it]" only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive "as to render [it] essentially at

home in the forum State." *Id.*, at \_\_\_ (slip op., at 2). Instructed by *Goodyear*, we conclude Daimler is not "at home" in California, and cannot be sued there for injuries plaintiffs attribute to MB Argentina's conduct in Argentina.

## I

In 2004, plaintiffs (respondents here) filed suit in the United States District Court for the Northern District of California, alleging that MB Argentina collaborated with Argentinian state security forces to kidnap, detain, torture, and kill plaintiffs and their relatives during the military dictatorship in place there from 1976 through 1983, a period known as Argentina's "Dirty War." Based on those allegations, plaintiffs asserted claims under the Alien Tort Statute, 28 U. S. C. §1350, and the Torture Victim Protection Act of 1991, 106 Stat. 73, note following 28 U. S. C. §1350, as well as claims for wrongful death and intentional infliction of emotional distress under the laws of California and Argentina. The incidents recounted in the complaint center on MB Argentina's plant in Gonzalez Catan, Argentina; no part of MB Argentina's alleged collaboration with Argentinian authorities took place in California or anywhere else in the United States.

Plaintiffs' operative complaint names only one corporate defendant: Daimler, the petitioner here. Plaintiffs seek to hold Daimler vicariously liable for MB Argentina's alleged malfeasance. Daimler is a German *Aktiengesellschaft* (public stock company) that manufactures Mercedes-Benz vehicles in Germany and has its headquarters in Stuttgart. At times relevant to this case, MB Argentina was a subsidiary wholly owned by Daimler's predecessor in interest.

Daimler moved to dismiss the action for want of personal jurisdiction. Opposing the motion, plaintiffs submitted declarations and exhibits purporting to demonstrate the presence of Daimler itself in California. Alternatively,

plaintiffs maintained that jurisdiction over Daimler could be founded on the California contacts of MBUSA, a distinct corporate entity that, according to plaintiffs, should be treated as Daimler's agent for jurisdictional purposes.

MBUSA, an indirect subsidiary of Daimler, is a Delaware limited liability corporation.[3]  MBUSA serves as Daimler's exclusive importer and distributor in the United States, purchasing Mercedes-Benz automobiles from Daimler in Germany, then importing those vehicles, and ultimately distributing them to independent dealerships located throughout the Nation.  Although MBUSA's principal place of business is in New Jersey, MBUSA has multiple California-based facilities, including a regional office in Costa Mesa, a Vehicle Preparation Center in Carson, and a Classic Center in Irvine.  According to the record developed below, MBUSA is the largest supplier of luxury vehicles to the California market.  In particular, over 10% of all sales of new vehicles in the United States take place in California, and MBUSA's California sales account for 2.4% of Daimler's worldwide sales.

The relationship between Daimler and MBUSA is delineated in a General Distributor Agreement, which sets forth requirements for MBUSA's distribution of Mercedes-Benz vehicles in the United States.  That agreement established MBUSA as an "independent contracto[r]" that "buy[s] and sell[s] [vehicles] . . . as an independent business for [its] own account."  App. 179a.  The agreement "does not make [MBUSA] . . . a general or special agent, partner, joint venturer or employee of DAIMLERCHRYSLER or any DaimlerChrysler Group Company"; MBUSA "ha[s] no authority to make binding obligations for or act on behalf of DAIMLERCHRYSLER or any DaimlerChrysler Group Company."  *Ibid.*

---

[3] At times relevant to this suit, MBUSA was wholly owned by Daimler-Chrysler North America Holding Corporation, a Daimler subsidiary.

After allowing jurisdictional discovery on plaintiffs' agency allegations, the District Court granted Daimler's motion to dismiss. Daimler's own affiliations with California, the court first determined, were insufficient to support the exercise of all-purpose jurisdiction over the corporation. *Bauman* v. *DaimlerChrysler AG*, No. C–04–00194 RMW (ND Cal., Nov. 22, 2005), App. to Pet. for Cert. 111a–112a, 2005 WL 3157472, *9–*10. Next, the court declined to attribute MBUSA's California contacts to Daimler on an agency theory, concluding that plaintiffs failed to demonstrate that MBUSA acted as Daimler's agent. *Id.,* at 117a, 133a, 2005 WL 3157472, *12, *19; *Bauman* v. *DaimlerChrysler AG*, No. C–04–00194 RMW (ND Cal., Feb. 12, 2007), App. to Pet. for Cert. 83a–85a, 2007 WL 486389, *2.

The Ninth Circuit at first affirmed the District Court's judgment. Addressing solely the question of agency, the Court of Appeals held that plaintiffs had not shown the existence of an agency relationship of the kind that might warrant attribution of MBUSA's contacts to Daimler. *Bauman* v. *DaimlerChrysler Corp.*, 579 F. 3d 1088, 1096–1097 (2009). Judge Reinhardt dissented. In his view, the agency test was satisfied and considerations of "reasonableness" did not bar the exercise of jurisdiction. *Id.,* at 1098–1106. Granting plaintiffs' petition for rehearing, the panel withdrew its initial opinion and replaced it with one authored by Judge Reinhardt, which elaborated on reasoning he initially expressed in dissent. *Bauman* v. *DaimlerChrysler Corp.*, 644 F. 3d 909 (CA9 2011).

Daimler petitioned for rehearing and rehearing en banc, urging that the exercise of personal jurisdiction over Daimler could not be reconciled with this Court's decision in *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. ___ (2011). Over the dissent of eight judges, the Ninth Circuit denied Daimler's petition. See *Bauman* v. *DaimlerChrysler Corp.*, 676 F. 3d 774 (2011) (O'Scannlain,

J., dissenting from denial of rehearing en banc).

We granted certiorari to decide whether, consistent with the Due Process Clause of the Fourteenth Amendment, Daimler is amenable to suit in California courts for claims involving only foreign plaintiffs and conduct occurring entirely abroad. 569 U. S. ___ (2013).

## II

Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons. See Fed. Rule Civ. Proc. 4(k)(1)(A) (service of process is effective to establish personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"). Under California's long-arm statute, California state courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." Cal. Civ. Proc. Code Ann. §410.10 (West 2004). California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U. S. Constitution. We therefore inquire whether the Ninth Circuit's holding comports with the limits imposed by federal due process. See, *e.g., Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 464 (1985).

## III

In *Pennoyer* v. *Neff*, 95 U. S. 714 (1878), decided shortly after the enactment of the Fourteenth Amendment, the Court held that a tribunal's jurisdiction over persons reaches no farther than the geographic bounds of the forum. See *id.,* at 720 ("The authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established."). See also *Shaffer* v. *Heitner*, 433 U. S. 186, 197 (1977) (Under *Pennoyer*, "any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the

inherent limits of the State's power."). In time, however, that strict territorial approach yielded to a less rigid understanding, spurred by "changes in the technology of transportation and communication, and the tremendous growth of interstate business activity." *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 617 (1990) (opinion of SCALIA, J.).

"The canonical opinion in this area remains *International Shoe [Co.* v. *Washington]*, 326 U. S. 310 [(1945)], in which we held that a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Goodyear*, 564 U. S., at ___ (slip op., at 6) (quoting *International Shoe*, 326 U. S., at 316). Following *International Shoe*, "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States on which the rules of *Pennoyer* rest, became the central concern of the inquiry into personal jurisdiction." *Shaffer*, 433 U. S., at 204.

*International Shoe*'s conception of "fair play and substantial justice" presaged the development of two categories of personal jurisdiction. The first category is represented by *International Shoe* itself, a case in which the in-state activities of the corporate defendant "ha[d] not only been continuous and systematic, but also g[a]ve rise to the liabilities sued on." 326 U. S., at 317.[4] *International Shoe* recognized, as well, that "the commission of some single or occasional acts of the corporate agent in a state" may sometimes be enough to subject the corporation to jurisdic-

─────────

[4] *International Shoe* was an action by the State of Washington to collect payments to the State's unemployment fund. Liability for the payments rested on in-state activities of resident sales solicitors engaged by the corporation to promote its wares in Washington. See 326 U. S., at 313–314.

tion in that State's tribunals with respect to suits relating to that in-state activity. *Id.,* at 318. Adjudicatory authority of this order, in which the suit "aris[es] out of or relate[s] to the defendant's contacts with the forum," *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 414, n. 8 (1984), is today called "specific jurisdiction." See *Goodyear*, 564 U. S., at ___ (slip op., at 7) (citing von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1144–1163 (1966) (hereinafter von Mehren & Trautman)).

*International Shoe* distinguished between, on the one hand, exercises of specific jurisdiction, as just described, and on the other, situations where a foreign corporation's "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." 326 U. S., at 318. As we have since explained, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 564 U. S., at ___ (slip op., at 2); see *id.,* at ___ (slip op., at 7); *Helicopteros*, 466 U. S., at 414, n. 9.[5]

———————

[5] Colloquy at oral argument illustrated the respective provinces of general and specific jurisdiction over persons. Two hypothetical scenarios were posed: *First*, if a California plaintiff, injured in a California accident involving a Daimler-manufactured vehicle, sued Daimler in California court alleging that the vehicle was defectively designed, that court's adjudicatory authority would be premised on specific jurisdiction. See Tr. of Oral Arg. 11 (Daimler's counsel acknowledged that specific jurisdiction "may well be . . . available" in such a case, depending on whether Daimler purposefully availed itself of the forum). *Second*, if a similar accident took place in Poland and injured Polish plaintiffs sued Daimler in California court, the question would be one of general jurisdiction. See *id.,* at 29 (on plaintiffs' view, Daimler would be amenable to such a suit in California).

Since *International Shoe*, "specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction [has played] a reduced role." *Goodyear*, 564 U. S., at ___ (slip op., at 8) (quoting Twitchell, The Myth of General Jurisdiction, 101 Harv. L. Rev. 610, 628 (1988)). *International Shoe*'s momentous departure from *Pennoyer*'s rigidly territorial focus, we have noted, unleashed a rapid expansion of tribunals' ability to hear claims against out-of-state defendants when the episode-in-suit occurred in the forum or the defendant purposefully availed itself of the forum.[6] Our subsequent decisions have continued to bear out the prediction that "specific jurisdiction will come into sharper relief and form a considerably more significant part of the scene." von Mehren & Trautman 1164.[7]

––––––––––

[6] See *Shaffer* v. *Heitner*, 433 U. S. 186, 204 (1977) ("The immediate effect of [*International Shoe*'s] departure from *Pennoyer*'s conceptual apparatus was to increase the ability of the state courts to obtain personal jurisdiction over nonresident defendants."); *McGee* v. *International Life Ins. Co.*, 355 U. S. 220, 222 (1957) ("[A] trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents."). For an early codification, see Uniform Interstate and International Procedure Act §1.02 (describing jurisdiction based on "[e]nduring [r]elationship" to encompass a person's domicile or a corporation's place of incorporation or principal place of business, and providing that "any . . . claim for relief" may be brought in such a place), §1.03 (describing jurisdiction "[b]ased upon [c]onduct," limited to claims arising from the enumerated acts, *e.g.,* "transacting any business in th[e] state," "contracting to supply services or things in th[e] state," or "causing tortious injury by an act or omission in th[e] state"), 9B U. L. A. 308, 310 (1966).

[7] See, *e.g., Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102, 112 (1987) (opinion of O'Connor, J.) (specific jurisdiction may lie over a foreign defendant that places a product into the "stream of commerce" while also "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State"); *World-Wide Volkswagen Corp.* v.

Our post-*International Shoe* opinions on general juris-
diction, by comparison, are few. "[The Court's] 1952 deci-
sion in *Perkins* v. *Benguet Consol. Mining Co.* remains the
textbook case of general jurisdiction appropriately exer-
cised over a foreign corporation that has not consented to
suit in the forum." *Goodyear*, 564 U. S., at ___ (slip op., at
11) (internal quotation marks and brackets omitted). The
defendant in *Perkins*, Benguet, was a company incorpo-
rated under the laws of the Philippines, where it operated
gold and silver mines. Benguet ceased its mining opera-
tions during the Japanese occupation of the Philippines in
World War II; its president moved to Ohio, where he kept
an office, maintained the company's files, and oversaw the
company's activities. *Perkins* v. *Benguet Consol. Mining
Co.*, 342 U. S. 437, 448 (1952). The plaintiff, an Ohio
resident, sued Benguet on a claim that neither arose in
Ohio nor related to the corporation's activities in that
State. We held that the Ohio courts could exercise general
jurisdiction over Benguet without offending due process.

_____

*Woodson*, 444 U. S. 286, 297 (1980) ("[I]f the sale of a product of a
manufacturer or distributor such as Audi or Volkswagen is not simply
an isolated occurrence, but arises from the efforts of the manufacturer
or distributor to serve, directly or indirectly, the market for its product
in other States, it is not unreasonable to subject it to suit in one of
those States if its allegedly defective merchandise has there been the
source of injury to its owner or to others."); *Calder* v. *Jones*, 465 U. S.
783, 789–790 (1984) (California court had specific jurisdiction to hear
suit brought by California plaintiff where Florida-based publisher of a
newspaper having its largest circulation in California published an
article allegedly defaming the complaining Californian; under those
circumstances, defendants "must 'reasonably anticipate being haled
into [a California] court'"); *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S.
770, 780–781 (1984) (New York resident may maintain suit for libel in
New Hampshire state court against California-based magazine that
sold 10,000 to 15,000 copies in New Hampshire each month; as long as
the defendant "continuously and deliberately exploited the New Hamp-
shire market," it could reasonably be expected to answer a libel suit
there).

*Ibid.* That was so, we later noted, because "Ohio was the corporation's principal, if temporary, place of business." *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 780, n. 11 (1984).[8]

—————

[8] Selectively referring to the trial court record in *Perkins* (as summarized in an opinion of the intermediate appellate court), JUSTICE SOTOMAYOR posits that Benguet may have had extensive operations in places other than Ohio. See *post,* at 11–12, n. 8 (opinion concurring in judgment) ("By the time the suit [in *Perkins*] was commenced, the company had resumed its considerable operations in the Philippines," "rebuilding its properties there" and "purchasing machinery, supplies and equipment." (internal quotation marks omitted)). See also *post,* at 7–8, n. 5 (many of the corporation's "key management decisions" were made by the out-of-state purchasing agent and chief of staff). JUSTICE SOTOMAYOR's account overlooks this Court's opinion in *Perkins* and the point on which that opinion turned: All of Benguet's activities were directed by the company's president from within Ohio. See *Perkins* v. *Benguet Consol. Mining Co.*, 342 U. S. 437, 447–448 (1952) (company's Philippine mining operations "were completely halted during the occupation . . . by the Japanese"; and the company's president, from his Ohio office, "supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines and . . . dispatched funds to cover purchases of machinery for such rehabilitation"). On another day, JUSTICE SOTOMAYOR joined a unanimous Court in recognizing: "To the extent that the company was conducting any business during and immediately after the Japanese occupation of the Philippines, it was doing so in Ohio . . . ." *Goodyear Dunlop Tires Operations*, *S. A.* v. *Brown*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 11). Given the wartime circumstances, Ohio could be considered "a surrogate for the place of incorporation or head office." von Mehren & Trautman 1144. See also *ibid.* (*Perkins* "should be regarded as a decision on its exceptional facts, not as a significant reaffirmation of obsolescing notions of general jurisdiction" based on nothing more than a corporation's "doing business" in a forum).

JUSTICE SOTOMAYOR emphasizes *Perkins'* statement that Benguet's Ohio contacts, while "continuous and systematic," were but a "limited . . . part of its general business." 342 U. S., at 438. Describing the company's "wartime activities" as "necessarily limited," *id.,* at 448, however, this Court had in mind the diminution in operations resulting from the Japanese occupation and the ensuing shutdown of the company's Philippine mines. No fair reader of the full opinion in *Perkins* could conclude that the Court meant to convey anything other than

The next case on point, *Helicopteros,* 466 U. S. 408, arose from a helicopter crash in Peru. Four U. S. citizens perished in that accident; their survivors and representatives brought suit in Texas state court against the helicopter's owner and operator, a Colombian corporation. That company's contacts with Texas were confined to "sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas-based helicopter company] for substantial sums; and sending personnel to [Texas] for training." *Id.,* at 416. Notably, those contacts bore no apparent relationship to the accident that gave rise to the suit. We held that the company's Texas connections did not resemble the "continuous and systematic general business contacts . . . found to exist in *Perkins.*" *Ibid.* "[M]ere purchases, even if occurring at regular intervals," we clarified, "are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Id.,* at 418.

Most recently, in *Goodyear*, we answered the question: "Are foreign subsidiaries of a United States parent corporation amenable to suit in state court on claims unrelated to any activity of the subsidiaries in the forum State?" 564 U. S., at ___ (slip op., at 1). That case arose from a bus accident outside Paris that killed two boys from North Carolina. The boys' parents brought a wrongful-death suit in North Carolina state court alleging that the bus's tire was defectively manufactured. The complaint named as defendants not only The Goodyear Tire and Rubber Com-

———————

that Ohio was the center of the corporation's wartime activities. But cf. *post,* at 9 ("If anything, [*Perkins*] intimated that the defendant's Ohio contacts were *not* substantial in comparison to its contacts elsewhere.").

pany (Goodyear), an Ohio corporation, but also Goodyear's Turkish, French, and Luxembourgian subsidiaries. Those foreign subsidiaries, which manufactured tires for sale in Europe and Asia, lacked any affiliation with North Carolina. A small percentage of tires manufactured by the foreign subsidiaries were distributed in North Carolina, however, and on that ground, the North Carolina Court of Appeals held the subsidiaries amenable to the general jurisdiction of North Carolina courts.

We reversed, observing that the North Carolina court's analysis "elided the essential difference between case-specific and all-purpose (general) jurisdiction." *Id.,* at ___ (slip op., at 10). Although the placement of a product into the stream of commerce "may bolster an affiliation germane to *specific* jurisdiction," we explained, such contacts "do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant." *Id.,* at ___ (slip op., at 10–11). As *International Shoe* itself teaches, a corporation's "continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." 326 U. S., at 318. Because Goodyear's foreign subsidiaries were "in no sense at home in North Carolina," we held, those subsidiaries could not be required to submit to the general jurisdiction of that State's courts. 564 U. S., at ___ (slip op., at 13). See also *J. McIntyre Machinery, Ltd.* v. *Nicastro*, 564 U. S. ___, ___ (2011) (GINSBURG, J., dissenting) (slip op., at 7) (noting unanimous agreement that a foreign manufacturer, which engaged an independent U. S.-based distributor to sell its machines throughout the United States, could not be exposed to all-purpose jurisdiction in New Jersey courts based on those contacts).

As is evident from *Perkins*, *Helicopteros*, and *Goodyear*, general and specific jurisdiction have followed markedly different trajectories post-*International Shoe*. Specific jurisdiction has been cut loose from *Pennoyer*'s sway, but

we have declined to stretch general jurisdiction beyond limits traditionally recognized.[9]  As this Court has increasingly trained on the "relationship among the defendant, the forum, and the litigation," *Shaffer*, 433 U. S., at 204, *i.e.,* specific jurisdiction,[10] general jurisdiction has come to occupy a less dominant place in the contemporary scheme.[11]

## IV

With this background, we turn directly to the question

_____

[9] See generally von Mehren & Trautman 1177–1179.  See also Twitchell, The Myth of General Jurisdiction, 101 Harv. L. Rev. 610, 676 (1988) ("[W]e do not need to justify broad exercises of dispute-blind jurisdiction unless our interpretation of the scope of specific jurisdiction unreasonably limits state authority over nonresident defendants."); Borchers, The Problem With General Jurisdiction, 2001 U. Chi. Legal Forum 119, 139 ("[G]eneral jurisdiction exists as an imperfect safety valve that sometimes allows plaintiffs access to a reasonable forum in cases when specific jurisdiction would deny it.").

[10] Remarkably, JUSTICE SOTOMAYOR treats specific jurisdiction as though it were barely there.  Given the many decades in which specific jurisdiction has flourished, it would be hard to conjure up an example of the "deep injustice" JUSTICE SOTOMAYOR predicts as a consequence of our holding that California is not an all-purpose forum for suits against Daimler.  *Post,* at 16.  JUSTICE SOTOMAYOR identifies "the concept of reciprocal fairness" as the "touchstone principle of due process in this field."  *Post,* at 10 (citing *International Shoe*, 326 U. S., at 319).  She overlooks, however, that in the very passage of *International Shoe* on which she relies, the Court left no doubt that it was addressing specific— not general—jurisdiction.  See *id.*, at 319 ("The exercise of th[e] privilege [of conducting corporate activities within a State] may give rise to obligations, and, *so far as those obligations arise out of or are connected with the activities within the state*, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." (emphasis added)).

[11] As the Court made plain in *Goodyear* and repeats here, general jurisdiction requires affiliations "so 'continuous and systematic' as to render [the foreign corporation] essentially at home in the forum State." 564 U. S., at ___ (slip op., at 2), *i.e.,* comparable to a domestic enterprise in that State.

whether Daimler's affiliations with California are sufficient to subject it to the general (all-purpose) personal jurisdiction of that State's courts. In the proceedings below, the parties agreed on, or failed to contest, certain points we now take as given. Plaintiffs have never attempted to fit this case into the *specific* jurisdiction category. Nor did plaintiffs challenge on appeal the District Court's holding that Daimler's own contacts with California were, by themselves, too sporadic to justify the exercise of general jurisdiction. While plaintiffs ultimately persuaded the Ninth Circuit to impute MBUSA's California contacts to Daimler on an agency theory, at no point have they maintained that MBUSA is an alter ego of Daimler.

Daimler, on the other hand, failed to object below to plaintiffs' assertion that the California courts could exercise all-purpose jurisdiction over MBUSA.[12] But see Brief for Petitioner 23, n. 4 (suggestion that in light of *Goodyear*, MBUSA may not be amenable to general jurisdiction in California); Brief for United States as *Amicus Curiae* 16, n. 5 (hereinafter U. S. Brief) (same). We will assume then, for purposes of this decision only, that MBUSA qualifies as at home in California.

A

In sustaining the exercise of general jurisdiction over Daimler, the Ninth Circuit relied on an agency theory, determining that MBUSA acted as Daimler's agent for jurisdictional purposes and then attributing MBUSA's California contacts to Daimler. The Ninth Circuit's agency analysis derived from Circuit precedent considering principally whether the subsidiary "performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the

———————
[12] MBUSA is not a defendant in this case.

corporation's own officials would undertake to perform substantially similar services." 644 F. 3d, at 920 (quoting *Doe* v. *Unocal Corp.*, 248 F. 3d 915, 928 (CA9 2001); emphasis deleted).

This Court has not yet addressed whether a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary. Daimler argues, and several Courts of Appeals have held, that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego. The Ninth Circuit adopted a less rigorous test based on what it described as an "agency" relationship. Agencies, we note, come in many sizes and shapes: "One may be an agent for some business purposes and not others so that the fact that one may be an agent for one purpose does not make him or her an agent for every purpose." 2A C. J. S., Agency §43, p. 367 (2013) (footnote omitted).[13] A subsidiary, for example, might be

---

[13] Agency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction. "[T]he corporate personality," *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), observed, "is a fiction, although a fiction intended to be acted upon as though it were a fact." *Id.*, at 316. See generally 1 W. Fletcher, Cyclopedia of the Law of Corporations §30, p. 30 (Supp. 2012–2013) ("A corporation is a distinct legal entity that can act only through its agents."). As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there. See, *e.g., Asahi*, 480 U. S., at 112 (opinion of O'Connor, J.) (defendant's act of "marketing [a] product through a distributor who has agreed to serve as the sales agent in the forum State" may amount to purposeful availment); *International Shoe*, 326 U. S., at 318 ("the commission of some single or occasional acts of the corporate agent in a state" may sometimes "be deemed sufficient to render the corporation liable to suit" on related claims). See also Brief for Petitioner 24 (acknowledging that "an agency relationship may be sufficient in some circumstances to give rise to *specific* jurisdiction"). It does not inevitably follow, however, that similar reasoning applies to *general* jurisdiction. Cf. *Goodyear*, 564 U. S., at ___ (slip op., at 10) (faulting analysis that "elided the essential difference between case-specific and all-purpose (general) jurisdiction").

its parent's agent for claims arising in the place where the subsidiary operates, yet not its agent regarding claims arising elsewhere. The Court of Appeals did not advert to that prospect. But we need not pass judgment on invocation of an agency theory in the context of general jurisdiction, for in no event can the appeals court's analysis be sustained.

The Ninth Circuit's agency finding rested primarily on its observation that MBUSA's services were "important" to Daimler, as gauged by Daimler's hypothetical readiness to perform those services itself if MBUSA did not exist. Formulated this way, the inquiry into importance stacks the deck, for it will always yield a pro-jurisdiction answer: "Anything a corporation does through an independent contractor, subsidiary, or distributor is presumably something that the corporation would do 'by other means' if the independent contractor, subsidiary, or distributor did not exist." 676 F. 3d, at 777 (O'Scannlain, J., dissenting from denial of rehearing en banc).[14] The Ninth Circuit's agency theory thus appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the "sprawling view of general jurisdiction" we rejected in *Goodyear*. 564 U. S., at \_\_\_ (slip op., at 12).[15]

———————

[14] Indeed, plaintiffs do not defend this aspect of the Ninth Circuit's analysis. See Brief for Respondents 39, n. 18 ("We do not believe that this gloss is particularly helpful.").

[15] The Ninth Circuit's agency analysis also looked to whether the parent enjoys "the right to substantially control" the subsidiary's activities. *Bauman* v. *DaimlerChrysler Corp.*, 644 F. 3d 909, 924 (2011). The Court of Appeals found the requisite "control" demonstrated by the General Distributor Agreement between Daimler and MBUSA, which gives Daimler the right to oversee certain of MBUSA's operations, even though that agreement expressly disavowed the creation of any agency relationship. Thus grounded, the separate inquiry into control hardly curtails the overbreadth of the Ninth Circuit's agency holding.

B

Even if we were to assume that MBUSA is at home in California, and further to assume MBUSA's contacts are imputable to Daimler, there would still be no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there.[16]

*Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." 564 U. S., at ___ (slip op., at 7) (citing Brilmayer et al., A General Look at General Jurisdiction, 66 Texas L. Rev. 721, 728 (1988)). With respect to a corpora-

---

[16] By addressing this point, JUSTICE SOTOMAYOR asserts, we have strayed from the question on which we granted certiorari to decide an issue not argued below. *Post,* at 5–6. That assertion is doubly flawed. First, the question on which we granted certiorari, as stated in Daimler's petition, is "whether it violates due process for a court to exercise general personal jurisdiction over a foreign corporation based solely on the fact that an indirect corporate subsidiary performs services on behalf of the defendant in the forum State." Pet. for Cert. i. That question fairly encompasses an inquiry into whether, in light of *Goodyear*, Daimler can be considered at home in California based on MBUSA's in-state activities. See also this Court's Rule 14.1(a) (a party's statement of the question presented "is deemed to comprise every subsidiary question fairly included therein"). Moreover, both in the Ninth Circuit, see, *e.g.,* Brief for Federation of German Industries et al. as *Amici Curiae* in No. 07–15386 (CA9), p. 3, and in this Court, see, *e.g.,* U. S. Brief 13–18; Brief for Chamber of Commerce of United States of America et al. as *Amici Curiae* 6–23; Brief for Lea Brilmayer as *Amica Curiae* 10–12, *amici* in support of Daimler homed in on the insufficiency of Daimler's California contacts for general jurisdiction purposes. In short, and in light of our pathmarking opinion in *Goodyear*, we perceive no unfairness in deciding today that California is not an all-purpose forum for claims against Daimler.

tion, the place of incorporation and principal place of business are "paradig[m] . . . bases for general jurisdiction." *Id.*, at 735. See also Twitchell, 101 Harv. L. Rev., at 633. Those affiliations have the virtue of being unique— that is, each ordinarily indicates only one place—as well as easily ascertainable. Cf. *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94 (2010) ("Simple jurisdictional rules . . . promote greater predictability."). These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims.

*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums. Plaintiffs would have us look beyond the exemplar bases *Goodyear* identified, and approve the exercise of general jurisdiction in every State in which a corporation "engages in a substantial, continuous, and systematic course of business." Brief for Respondents 16–17, and nn. 7–8. That formulation, we hold, is unacceptably grasping.

As noted, see *supra,* at 7–8, the words "continuous and systematic" were used in *International Shoe* to describe instances in which the exercise of *specific* jurisdiction would be appropriate. See 326 U. S., at 317 (jurisdiction can be asserted where a corporation's in-state activities are not only "continuous and systematic, but also give rise to the liabilities sued on").[17] Turning to all-purpose jurisdiction, in contrast, *International Shoe* speaks of "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify

––––––––

[17] *International Shoe* also recognized, as noted above, see *supra,* at 7–8, that "some single or occasional acts of the corporate agent in a state . . . , because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit." 326 U. S., at 318.

suit . . . *on causes of action arising from dealings en-
tirely distinct from those activities.*"  *Id.,* at 318 (emphasis
added).  See also Twitchell, Why We Keep Doing Business
With Doing-Business Jurisdiction, 2001 U. Chi. Legal
Forum 171, 184 (*International Shoe* "is clearly not saying
that dispute-blind jurisdiction exists whenever 'continuous
and systematic' contacts are found.").[18]  Accordingly, the
inquiry under *Goodyear* is not whether a foreign corpora-
tion's in-forum contacts can be said to be in some sense
"continuous and systematic," it is whether that corpora-
tion's "affiliations with the State are so 'continuous and
systematic' as to render [it] essentially at home in the
forum State."  564 U. S., at ___ (slip op., at 2).[19]

Here, neither Daimler nor MBUSA is incorporated in

————————

[18] Plaintiffs emphasize two decisions, *Barrow S. S. Co.* v. *Kane*, 170
U. S. 100 (1898), and *Tauza* v. *Susquehanna Coal Co.*, 220 N. Y. 259,
115 N. E. 915 (1917) (Cardozo, J.), both cited in *Perkins* v. *Benguet
Consol. Mining Co.*, 342 U. S. 437 (1952), just after the statement that
a corporation's continuous operations in-state may suffice to establish
general jurisdiction.  *Id.*, at 446, and n. 6.  See also *International Shoe*,
326 U. S., at 318 (citing *Tauza*).  *Barrow* and *Tauza* indeed upheld the
exercise of general jurisdiction based on the presence of a local office,
which signaled that the corporation was "doing business" in the forum.
*Perkins'* unadorned citations to these cases, both decided in the era
dominated by *Pennoyer*'s territorial thinking, see *supra,* at 6–7, should
not attract heavy reliance today.  See generally Feder, *Goodyear*,
"Home," and the Uncertain Future of Doing Business Jurisdiction, 63
S. C. L. Rev. 671 (2012) (questioning whether "doing business" should
persist as a basis for general jurisdiction).

[19] We do not foreclose the possibility that in an exceptional case, see,
*e.g., Perkins*, described *supra,* at 10–12, and n. 8, a corporation's opera-
tions in a forum other than its formal place of incorporation or principal
place of business may be so substantial and of such a nature as to
render the corporation at home in that State.  But this case presents no
occasion to explore that question, because Daimler's activities in
California plainly do not approach that level.  It is one thing to hold a
corporation answerable for operations in the forum State, see *infra*, at
23, quite another to expose it to suit on claims having no connection
whatever to the forum State.

California, nor does either entity have its principal place of business there. If Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA's sales are sizable. Such exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Burger King Corp.*, 471 U. S., at 472 (internal quotation marks omitted).

It was therefore error for the Ninth Circuit to conclude that Daimler, even with MBUSA's contacts attributed to it, was at home in California, and hence subject to suit there on claims by foreign plaintiffs having nothing to do with anything that occurred or had its principal impact in California.[20]

––––––––––

[20] To clarify in light of JUSTICE SOTOMAYOR's opinion concurring in the judgment, the general jurisdiction inquiry does not "focu[s] solely on the magnitude of the defendant's in-state contacts." *Post,* at 8. General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, "at home" would be synonymous with "doing business" tests framed before specific jurisdiction evolved in the United States. See von Mehren & Trautman 1142–1144. Nothing in *International Shoe* and its progeny suggests that "a particular quantum of local activity" should give a State authority over a "far larger quantum of . . . activity" having no connection to any in-state activity. Feder, *supra,* at 694.

JUSTICE SOTOMAYOR would reach the same result, but for a different reason. Rather than concluding that Daimler is not at home in California, JUSTICE SOTOMAYOR would hold that the exercise of general jurisdiction over Daimler would be unreasonable "in the unique circumstances of this case." *Post,* at 1. In other words, she favors a resolution fit for this day and case only. True, a multipronged reasonableness check was articulated in *Asahi*, 480 U. S., at 113–114, but not as a free-floating test. Instead, the check was to be essayed when *specific* jurisdiction is at issue. See also *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 476–478 (1985). First, a court is to determine whether the

## C

Finally, the transnational context of this dispute bears attention. The Court of Appeals emphasized, as supportive of the exercise of general jurisdiction, plaintiffs' assertion of claims under the Alien Tort Statute (ATS), 28 U. S. C. §1350, and the Torture Victim Protection Act of 1991 (TVPA), 106 Stat. 73, note following 28 U. S. C. §1350. See 644 F. 3d, at 927 ("American federal courts, be they in California or any other state, have a strong interest in adjudicating and redressing international human rights abuses."). Recent decisions of this Court, however, have rendered plaintiffs' ATS and TVPA claims infirm. See *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. ___, ___ (2013) (slip op., at 14) (presumption against extraterritorial application controls claims under the ATS); *Mohamad* v. *Palestinian Authority*, 566 U. S. ___, ___ (2012)

———————

connection between the forum and the episode-in-suit could justify the exercise of specific jurisdiction. Then, in a second step, the court is to consider several additional factors to assess the reasonableness of entertaining the case. When a corporation is genuinely at home in the forum State, however, any second-step inquiry would be superfluous.

JUSTICE SOTOMAYOR fears that our holding will "lead to greater unpredictability by radically expanding the scope of jurisdictional discovery." *Post,* at 14. But it is hard to see why much in the way of discovery would be needed to determine where a corporation is at home. JUSTICE SOTOMAYOR's proposal to import *Asahi*'s "reasonableness" check into the general jurisdiction determination, on the other hand, would indeed compound the jurisdictional inquiry. The reasonableness factors identified in *Asahi* include "the burden on the defendant," "the interests of the forum State," "the plaintiff's interest in obtaining relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," "the shared interest of the several States in furthering fundamental substantive social policies," and, in the international context, "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction." 480 U. S., at 113–115 (some internal quotation marks omitted). Imposing such a checklist in cases of general jurisdiction would hardly promote the efficient disposition of an issue that should be resolved expeditiously at the outset of litigation.

(slip op., at 1) (only natural persons are subject to liability under the TVPA).

The Ninth Circuit, moreover, paid little heed to the risks to international comity its expansive view of general jurisdiction posed. Other nations do not share the uninhibited approach to personal jurisdiction advanced by the Court of Appeals in this case. In the European Union, for example, a corporation may generally be sued in the nation in which it is "domiciled," a term defined to refer only to the location of the corporation's "statutory seat," "central administration," or "principal place of business." European Parliament and Council Reg. 1215/2012, Arts. 4(1), and 63(1), 2012 O. J. (L. 351) 7, 18. See also *id.*, Art. 7(5), 2012 O. J. 7 (as to "a dispute *arising out of the operations of a branch, agency or other establishment,*" a corporation may be sued "in the courts for the place where the branch, agency or other establishment is situated" (emphasis added)). The Solicitor General informs us, in this regard, that "foreign governments' objections to some domestic courts' expansive views of general jurisdiction have in the past impeded negotiations of international agreements on the reciprocal recognition and enforcement of judgments." U. S. Brief 2 (citing Juenger, The American Law of General Jurisdiction, 2001 U. Chi. Legal Forum 141, 161–162). See also U. S. Brief 2 (expressing concern that unpredictable applications of general jurisdiction based on activities of U. S.-based subsidiaries could discourage foreign investors); Brief for Respondents 35 (acknowledging that "doing business" basis for general jurisdiction has led to "international friction"). Considerations of international rapport thus reinforce our determination that subjecting Daimler to the general jurisdiction of courts in California would not accord with the "fair play and substantial justice" due process demands. *International Shoe*, 326 U. S., at 316 (quoting *Milliken* v. *Meyer*, 311 U. S. 457, 463 (1940)).

Opinion of the Court

\* \* \*

For the reasons stated, the judgment of the United States Court of Appeals for the Ninth Circuit is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–965

_____

## DAIMLER AG, PETITIONER *v.* BARBARA BAUMAN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 14, 2014]

JUSTICE SOTOMAYOR, concurring in the judgment.

I agree with the Court's conclusion that the Due Process Clause prohibits the exercise of personal jurisdiction over Daimler in light of the unique circumstances of this case. I concur only in the judgment, however, because I cannot agree with the path the Court takes to arrive at that result.

The Court acknowledges that Mercedes-Benz USA, LLC (MBUSA), Daimler's wholly owned subsidiary, has considerable contacts with California. It has multiple facilities in the State, including a regional headquarters. Each year, it distributes in California tens of thousands of cars, the sale of which generated billions of dollars in the year this suit was brought. And it provides service and sales support to customers throughout the State. Daimler has conceded that California courts may exercise general jurisdiction over MBUSA on the basis of these contacts, and the Court assumes that MBUSA's contacts may be attributed to Daimler for the purpose of deciding whether Daimler is also subject to general jurisdiction.

Are these contacts sufficient to permit the exercise of general jurisdiction over Daimler? The Court holds that they are not, for a reason wholly foreign to our due process jurisprudence. The problem, the Court says, is not that Daimler's contacts with California are too few, but that its

contacts with other forums are too many. In other words, the Court does not dispute that the presence of multiple offices, the direct distribution of thousands of products accounting for billions of dollars in sales, and continuous interaction with customers throughout a State would be enough to support the exercise of general jurisdiction over some businesses. Daimler is just not one of those businesses, the Court concludes, because its California contacts must be viewed in the context of its extensive "nationwide and worldwide" operations. *Ante,* at 21, n. 20. In recent years, Americans have grown accustomed to the concept of multinational corporations that are supposedly "too big to fail"; today the Court deems Daimler "too big for general jurisdiction."

The Court's conclusion is wrong as a matter of both process and substance. As to process, the Court decides this case on a ground that was neither argued nor passed on below, and that Daimler raised for the first time in a footnote to its brief. Brief for Petitioner 31–32, n. 5. As to substance, the Court's focus on Daimler's operations outside of California ignores the lodestar of our personal jurisdiction jurisprudence: A State may subject a defendant to the burden of suit if the defendant has sufficiently taken advantage of the State's laws and protections through its contacts in the State; whether the defendant has contacts elsewhere is immaterial.

Regrettably, these errors are unforced. The Court can and should decide this case on the far simpler ground that, no matter how extensive Daimler's contacts with California, that State's exercise of jurisdiction would be unreasonable given that the case involves foreign plaintiffs suing a foreign defendant based on foreign conduct, and given that a more appropriate forum is available. Because I would reverse the judgment below on this ground, I concur in the judgment only.

## I

I begin with the point on which the majority and I agree: The Ninth Circuit's decision should be reversed.

Our personal jurisdiction precedents call for a two-part analysis. The contacts prong asks whether the defendant has sufficient contacts with the forum State to support personal jurisdiction; the reasonableness prong asks whether the exercise of jurisdiction would be unreasonable under the circumstances. *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 475–478 (1985). As the majority points out, all of the cases in which we have applied the reasonableness prong have involved specific as opposed to general jurisdiction. *Ante,* at 21, n. 20. Whether the reasonableness prong should apply in the general jurisdiction context is therefore a question we have never decided,[1] and it is one on which I can appreciate the arguments on both sides. But it would be imprudent to decide that question in this case given that respondents have failed to argue against the application of the reasonableness prong during the entire 8-year history of this litigation. See Brief for Respondents 11, 12, 13, 16 (conceding application

---

[1] The Courts of Appeals have uniformly held that the reasonableness prong does in fact apply in the general jurisdiction context. See *Metropolitan Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F. 3d 560, 573 (CA2 1996) ("[E]very circuit that has considered the question has held, implicitly or explicitly, that the reasonableness inquiry is applicable to *all* questions of personal jurisdiction, general or specific"); see also, *e.g., Lakin* v. *Prudential Securities, Inc.*, 348 F. 3d 704, 713 (CA8 2003); *Base Metal Trading, Ltd.* v. *OJSC "Novokuznetsky Aluminum Factory,"* 283 F. 3d 208, 213–214 (CA4 2002); *Trierwelier* v. *Croxton & Trench Holding Corp.*, 90 F. 3d 1523, 1533 (CA10 1996); *Amoco Egypt Oil Co.* v. *Leonis Navigation Co.*, 1 F. 3d 848, 851, n. 2 (CA9 1993); *Donatelli* v. *National Hockey League*, 893 F. 2d 459, 465 (CA1 1990); *Bearry* v. *Beech Aircraft Corp.*, 818 F. 2d 370, 377 (CA5 1987). Without the benefit of a single page of briefing on the issue, the majority casually adds each of these cases to the mounting list of decisions jettisoned as a consequence of today's ruling. See *ante,* at 21, n. 20.

of the reasonableness inquiry); Plaintiffs' Opposition to Defendant's Motion to Quash Service of Process and to Dismiss for Lack of Personal Jurisdiction in No. 04–00194–RMW (ND Cal., May 16, 2005), pp. 14–23 (same). As a result, I would decide this case under the reasonableness prong without foreclosing future consideration of whether that prong should be limited to the specific jurisdiction context.[2]

We identified the factors that bear on reasonableness in *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102 (1987): "the burden on the defendant, the interests of the forum State," "the plaintiff's interest in obtaining relief" in the forum State, and the interests of other sovereigns in resolving the dispute. *Id.,* at 113–114. We held in *Asahi* that it would be "unreasonable and unfair" for a California court to exercise jurisdiction over a claim between a Taiwanese plaintiff and a Japanese defendant that arose out of a transaction in Taiwan, particularly where the Taiwanese plaintiff had not shown that it would be more convenient to litigate in California than in Taiwan or Japan. *Id.,* at 114.

The same considerations resolve this case. It involves Argentine plaintiffs suing a German defendant for conduct that took place in Argentina. Like the plaintiffs in *Asahi*, respondents have failed to show that it would be more convenient to litigate in California than in Germany, a

_____

[2] While our decisions rejecting the exercise of personal jurisdiction have typically done so under the minimum-contacts prong, we have never required that prong to be decided first. See *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102, 121 (1987) (Stevens, J., concurring in part and concurring in judgment) (rejecting personal jurisdiction under the reasonableness prong and declining to consider the minimum-contacts prong because doing so would not be "necessary"). And although the majority frets that deciding this case on the reasonableness ground would be "a resolution fit for this day and case only," *ante*, at 21, n. 20, I do not understand our constitutional duty to require otherwise.

sovereign with a far greater interest in resolving the dispute. *Asahi* thus makes clear that it would be unreasonable for a court in California to subject Daimler to its jurisdiction.

## II

The majority evidently agrees that, if the reasonableness prong were to apply, it would be unreasonable for California courts to exercise jurisdiction over Daimler in this case. See *ante*, at 20–21 (noting that it would be "exorbitant" for California courts to exercise general jurisdiction over Daimler, a German defendant, in this "Argentina-rooted case" brought by "foreign plaintiffs"). But instead of resolving the case on this uncontroversial basis, the majority reaches out to decide it on a ground neither argued nor decided below.[3]

We generally do not pass on arguments that lower courts have not addressed. See, *e.g., Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). After all, "we are a court of review, not of first view." *Ibid.* This principle carries even greater force where the argument at issue was never pressed below. See *Glover* v. *United States*, 531 U. S. 198, 205 (2001). Yet the majority disregards this principle, basing its decision on an argument raised for the first time

––––––––––

[3] The majority appears to suggest that Daimler may have presented the argument in its petition for rehearing en banc before the Ninth Circuit. See *ante,* at 5 (stating that Daimler "urg[ed] that the exercise of personal jurisdiction . . . could not be reconciled with this Court's decision in *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. ___ (2011)"). But Daimler's petition for rehearing did not argue what the Court holds today. The Court holds that Daimler's California contacts would be insufficient for general jurisdiction even assuming that MBUSA's contacts may be attributed to Daimler. Daimler's rehearing petition made a distinct argument—that attribution of MBUSA's contacts should not be permitted under an "'agency' theory" because doing so would "rais[e] significant constitutional concerns" under *Goodyear*. Petition for Rehearing or Rehearing En Banc in No. 07–15386 (CA9), p. 9.

in a footnote of Daimler's merits brief before this Court. Brief for Petitioner 32, n. 5 ("Even if MBUSA were a division of Daimler AG rather than a separate corporation, Daimler AG would still . . . not be 'at home' in California").

The majority's decision is troubling all the more because the parties were not asked to brief this issue. We granted certiorari on the question "whether it violates due process for a court to exercise general personal jurisdiction over a foreign corporation based solely on the fact that an indirect corporate subsidiary performs services on behalf of the defendant in the forum State." Pet. for Cert. i. At no point in Daimler's petition for certiorari did the company contend that, even if this attribution question were decided against it, its contacts in California would still be insufficient to support general jurisdiction. The parties' merits briefs accordingly focused on the attribution-of-contacts question, addressing the reasonableness inquiry (which had been litigated and decided below) in most of the space that remained. See Brief for Petitioner 17–37, 37–43; Brief for Respondents 18–47, 47–59.

In bypassing the question on which we granted certiorari to decide an issue not litigated below, the Court leaves respondents "without an unclouded opportunity to air the issue the Court today decides against them," *Comcast Corp.* v. *Behrend*, 569 U. S. ___, ___ (2013) (GINSBURG and BREYER, JJ., dissenting) (slip op., at 3). Doing so "does 'not reflect well on the processes of the Court.'" *Ibid.* (quoting *Redrup* v. *New York*, 386 U. S. 767, 772 (1967) (Harlan, J., dissenting)). "And by resolving a complex and fact-intensive question without the benefit of full briefing, the Court invites the error into which it has fallen." 569 U. S., at ___ (slip op., at 3).

The relevant facts are undeveloped because Daimler conceded at the start of this litigation that MBUSA is subject to general jurisdiction based on its California contacts. We therefore do not know the full extent of those

contacts, though what little we do know suggests that Daimler was wise to concede what it did. MBUSA imports more than 200,000 vehicles into the United States and distributes many of them to independent dealerships in California, where they are sold. Declaration of Dr. Peter Waskönig in *Bauman* v. *DaimlerChrysler Corp.*, No. 04–00194–RMW (ND Cal.), ¶ 10, p. 2. MBUSA's California sales account for 2.4% of Daimler's worldwide sales, which were $192 billion in 2004.[4] And 2.4% of $192 billion is $4.6 billion, a considerable sum by any measure. MBUSA also has multiple offices and facilities in California, including a regional headquarters.

But the record does not answer a number of other important questions. Are any of Daimler's key files maintained in MBUSA's California offices? How many employees work in those offices? Do those employees make important strategic decisions or oversee in any manner Daimler's activities? These questions could well affect whether Daimler is subject to general jurisdiction. After all, this Court upheld the exercise of general jurisdiction in *Perkins* v. *Benguet Consol. Mining Co.*, 342 U. S. 437, 447–448 (1952)—which the majority refers to as a "textbook case" of general jurisdiction, *ante*, at 10—on the basis that the foreign defendant maintained an office in Ohio, kept corporate files there, and oversaw the company's activities from the State. California-based MBUSA employees may well have done similar things on Daimler's behalf.[5] But because the Court decides the issue without a

_____

[4]See DaimlerChrysler, Innovations for our Customers: Annual Report 2004, p. 22, http://www.daimler.com/Projects/c2c/channel/documents/1364377_2004_DaimlerChrysler_Annual_Report.pdf (as visited on Jan. 8, 2014, and available in Clerk of Court's case file).

[5]To be sure, many of Daimler's key management decisions are undoubtedly made by employees outside California. But the same was true in *Perkins*. See *Perkins* v. *Benguet Consol. Min. Co.*, 88 Ohio App. 118, 124, 95 N. E. 2d 5, 8 (1950) (*per curiam*) (describing management

developed record, we will never know.

## III

While the majority's decisional process is problematic enough, I fear that process leads it to an even more troubling result.

## A

Until today, our precedents had established a straightforward test for general jurisdiction: Does the defendant have "continuous corporate operations within a state" that are "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities"? *International Shoe Co.* v. *Washington*, 326 U. S. 310, 318 (1945); see also *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 416 (1984) (asking whether defendant had "continuous and systematic general business contacts").[6] In every case where we have applied this test, we have focused solely on the magnitude of the defendant's in-state contacts, not the relative magnitude of those contacts in comparison to the defendant's contacts with other States.

In *Perkins*, for example, we found an Ohio court's exer-

––––––––

decisions made by the company's chief of staff in Manila and a purchasing agent in California); see also n. 8, *infra.*

[6] While *Helicopteros* formulated the general jurisdiction inquiry as asking whether a foreign defendant possesses "continuous and systematic general business contacts," 466 U. S., at 416, the majority correctly notes, *ante,* at 19, that *International Shoe* used the phrase "continuous and systematic" in the context of discussing specific jurisdiction, 326 U. S., at 317. But the majority recognizes that *International Shoe* separately described the type of contacts needed for general jurisdiction as "continuous corporate operations" that are "so substantial" as to justify suit on unrelated causes of action. *Id.*, at 318. It is unclear why our precedents departed from *International Shoe*'s "continuous and substantial" formulation in favor of the "continuous and systematic" formulation, but the majority does not contend—nor do I perceive—that there is a material difference between the two.

cise of general jurisdiction permissible where the president of the foreign defendant "maintained an office," "drew and distributed . . . salary checks," used "two active bank accounts," "supervised . . . the rehabilitation of the corporation's properties in the Philippines," and held "directors' meetings," in Ohio. 342 U. S., at 447–448. At no point did we attempt to catalog the company's contacts in forums other than Ohio or to compare them with its Ohio contacts. If anything, we intimated that the defendant's Ohio contacts were *not* substantial in comparison to its contacts elsewhere. See *id.*, at 438 (noting that the defendant's Ohio contacts, while "continuous and systematic," were but a "limited . . . part of its general business").[7]

   We engaged in the same inquiry in *Helicopteros*. There, we held that a Colombian corporation was not subject to general jurisdiction in Texas simply because it occasionally sent its employees into the State, accepted checks drawn on a Texas bank, and purchased equipment and services from a Texas company. In no sense did our analysis turn on the extent of the company's operations beyond

———————

   [7] The majority suggests that I misinterpret language in *Perkins* that I do not even cite. *Ante*, at 11, n. 8. The majority is quite correct that it has found a sentence in *Perkins* that does not address whether most of the Philippine corporation's activities took place outside of Ohio. See *ante*, at 11, n. 8 (noting that *Perkins* described the company's "wartime activities" as "necessarily limited," 342 U. S., at 448). That is why I did not mention it. I instead rely on a sentence in *Perkins*' opening paragraph: "The [Philippine] corporation has been carrying on in Ohio a continuous and systematic, but limited, part of its general business." *Id.*, at 438. That sentence obviously does convey that most of the corporation's activities occurred in "places other than Ohio," *ante*, at 11, n. 8. This is not surprising given that the company's Ohio contacts involved a single officer working from a home office, while its non-Ohio contacts included significant mining properties and machinery operated throughout the Philippines, Philippine employees (including a chief of staff), a purchasing agent based in California, and board of directors meetings held in Washington, New York, and San Francisco. *Perkins*, 88 Ohio App., at 123–124, 95 N. E. 2d, at 8; see also n. 8, *infra.*

Texas.

Most recently, in *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. ___ (2011), our analysis again focused on the defendant's in-state contacts. *Goodyear* involved a suit against foreign tire manufacturers by North Carolina residents whose children had died in a bus accident in France. We held that North Carolina courts could not exercise general jurisdiction over the foreign defendants. Just as in *Perkins* and *Helicopteros*, our opinion in *Goodyear* did not identify the defendants' contacts outside of the forum State, but focused instead on the defendants' lack of offices, employees, direct sales, and business operations within the State.

This approach follows from the touchstone principle of due process in this field, the concept of reciprocal fairness. When a corporation chooses to invoke the benefits and protections of a State in which it operates, the State acquires the authority to subject the company to suit in its courts. See *International Shoe*, 326 U. S., at 319 ("[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state" such that an "obligatio[n] arise[s]" to respond there to suit); *J. McIntyre Machinery, Ltd.* v. *Nicastro*, 564 U. S. ___, ___ (2011) (plurality opinion) (slip op., at 5) (same principle for general jurisdiction). The majority's focus on the extent of a corporate defendant's out-of-forum contacts is untethered from this rationale. After all, the degree to which a company intentionally benefits from a forum State depends on its interactions with that State, not its interactions elsewhere. An article on which the majority relies (and on which *Goodyear* relied as well, 564 U. S., at ___ (slip op., at 7)) expresses the point well: "We should not treat defendants as less amenable to suit merely because they carry on more substantial business in other states . . . . [T]he amount of activity elsewhere seems virtually irrele-

vant to . . . the imposition of general jurisdiction over a defendant." Brilmayer et al., A General Look at General Jurisdiction, 66 Texas L. Rev. 721, 742 (1988).

Had the majority applied our settled approach, it would have had little trouble concluding that Daimler's California contacts rise to the requisite level, given the majority's assumption that MBUSA's contacts may be attributed to Daimler and given Daimler's concession that those contacts render MBUSA "at home" in California. Our cases have long stated the rule that a defendant's contacts with a forum State must be continuous, substantial, and systematic in order for the defendant to be subject to that State's general jurisdiction. See *Perkins*, 342 U. S., at 446. We offered additional guidance in *Goodyear*, adding the phrase "essentially at home" to our prior formulation of the rule. 564 U. S., at \_\_\_ (slip op., at 2) (a State may exercise general jurisdiction where a defendant's "affiliations with the State are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State"). We used the phrase "at home" to signify that in order for an out-of-state defendant to be subject to general jurisdiction, its continuous and substantial contacts with a forum State must be akin to those of a local enterprise that actually is "at home" in the State. See Brilmayer, *supra,* at 742.[8]

————————

[8] The majority views the phrase "at home" as serving a different purpose—that of requiring a comparison between a defendant's in-state and out-of-state contacts. *Ante,* at 21, n. 20. That cannot be the correct understanding though, because among other things it would cast grave doubt on *Perkins*—a case that *Goodyear* pointed to as an exemplar of general jurisdiction, 564 U. S., at \_\_\_ (slip op., at 11). For if *Perkins* had applied the majority's newly minted proportionality test, it would have come out the other way.

The majority apparently thinks that the Philippine corporate defendant in *Perkins* did not have meaningful operations in places other than Ohio. See *ante*, at 10–11, and n. 8. But one cannot get past the second sentence of *Perkins* before realizing that is wrong. That sentence reads:

SOTOMAYOR, J., concurring in judgment

Under this standard, Daimler's concession that MBUSA is subject to general jurisdiction in California (a concession the Court accepts, *ante,* at 15, 17) should be dispositive. For if MBUSA's California contacts are so substantial and the resulting benefits to MBUSA so significant as to make MBUSA "at home" in California, the same must be true of Daimler when MBUSA's contacts and benefits are viewed as its own. Indeed, until a footnote in its brief before this Court, even Daimler did not dispute this conclusion for eight years of the litigation.

## B

The majority today concludes otherwise. Referring to

———————

"The corporation has been carrying on in Ohio a continuous and systematic, but limited, part of its general business." 342 U. S., at 438. Indeed, the facts of the case set forth by the Ohio Court of Appeals show just how "limited" the company's Ohio contacts—which included a single officer keeping files and managing affairs from his Ohio home office—were in comparison with its "general business" operations elsewhere. By the time the suit was commenced, the company had resumed its considerable mining operations in the Philippines, "'rebuilding its properties' " there and purchasing " 'machinery, supplies and equipment.' " 88 Ohio App., at 123–124, 95 N. E. 2d, at 8. Moreover, the company employed key managers in other forums, including a purchasing agent in San Francisco and a chief of staff in the Philippines. *Id.*, at 124, 95 N. E. 2d, at 8. The San Francisco purchasing agent negotiated the purchase of the company's machinery and supplies "'on the direction of the Company's Chief of Staff in Manila,'" *ibid.,* a fact that squarely refutes the majority's assertion that "[a]ll of Benguet's activities were directed by the company's president from within Ohio," *ante,* at 11, n. 8. And the vast majority of the company's board of directors meetings took place outside Ohio, in locations such as Washington, New York, and San Francisco. 88 Ohio App., at 125, 94 N. E. 2d, at 8.

In light of these facts, it is all but impossible to reconcile the result in *Perkins* with the proportionality test the majority announces today. *Goodyear*'s use of the phrase "at home" is thus better understood to require the same general jurisdiction inquiry that *Perkins* required: An out-of-state business must have the kind of continuous and substantial in-state presence that a parallel local company would have.

the "continuous and systematic" contacts inquiry that has been taught to generations of first-year law students as "unacceptably grasping," *ante,* at 19, the majority announces the new rule that in order for a foreign defendant to be subject to general jurisdiction, it must not only possess continuous and systematic contacts with a forum State, but those contacts must also surpass some unspecified level when viewed in comparison to the company's "nationwide and worldwide" activities. *Ante,* at 21, n. 20.[9]

Neither of the majority's two rationales for this proportionality requirement is persuasive. First, the majority suggests that its approach is necessary for the sake of predictability. Permitting general jurisdiction in every State where a corporation has continuous and substantial contacts, the majority asserts, would "scarcely permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Ante,* at 21 (quoting *Burger King Corp.*, 471 U. S., at 472). But there is nothing unpredictable about a rule that instructs multinational corporations that if they engage in continuous and substantial contacts with more than one State, they will be subject to general jurisdiction in each one. The majority may not favor that rule as a matter of policy, but such disagreement does not render an otherwise routine

————————

[9] I accept at face value the majority's declaration that general jurisdiction is not limited to a corporation's place of incorporation and principal place of business because "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in the State." *Ante*, at 20, n. 19; see also *ante*, at 19. Were that not so, our analysis of the defendants' in-state contacts in *Perkins* v. *Benguet Consol. Mining Co.*, 342 U. S. 437 (1952), *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408 (1984), and *Goodyear* would have been irrelevant, as none of the defendants in those cases was sued in its place of incorporation or principal place of business.

test unpredictable.

Nor is the majority's proportionality inquiry any more predictable than the approach it rejects. If anything, the majority's approach injects an additional layer of uncertainty because a corporate defendant must now try to foretell a court's analysis as to both the sufficiency of its contacts with the forum State itself, as well as the relative sufficiency of those contacts in light of the company's operations elsewhere. Moreover, the majority does not even try to explain just how extensive the company's in-state contacts must be in the context of its global operations in order for general jurisdiction to be proper.

The majority's approach will also lead to greater unpredictability by radically expanding the scope of jurisdictional discovery. Rather than ascertaining the extent of a corporate defendant's forum-state contacts alone, courts will now have to identify the extent of a company's contacts in every other forum where it does business in order to compare them against the company's in-state contacts. That considerable burden runs headlong into the majority's recitation of the familiar principle that "'[s]imple jurisdictional rules . . . promote greater predictability.'" *Ante,* at 18–19 (quoting *Hertz Corp.* v. *Friend,* 559 U. S. 77, 94 (2010)).

Absent the predictability rationale, the majority's sole remaining justification for its proportionality approach is its unadorned concern for the consequences. "If Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California," the majority laments, "the same global reach would presumably be available in every other State in which MBUSA's sales are sizable." *Ante,* at 20.

The majority characterizes this result as "exorbitant," *ibid.,* but in reality it is an inevitable consequence of the rule of due process we set forth nearly 70 years ago, that there are "instances in which [a company's] continuous

corporate operations within a state" are "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities," *International Shoe*, 326 U. S., at 318. In the era of *International Shoe*, it was rare for a corporation to have such substantial nationwide contacts that it would be subject to general jurisdiction in a large number of States. Today, that circumstance is less rare. But that is as it should be. What has changed since *International Shoe* is not the due process principle of fundamental fairness but rather the nature of the global economy. Just as it was fair to say in the 1940's that an out-of-state company could enjoy the benefits of a forum State enough to make it "essentially at home" in the State, it is fair to say today that a multinational conglomerate can enjoy such extensive benefits in multiple forum States that it is "essentially at home" in each one.

In any event, to the extent the majority is concerned with the modern-day consequences of *International Shoe*'s conception of personal jurisdiction, there remain other judicial doctrines available to mitigate any resulting unfairness to large corporate defendants. Here, for instance, the reasonableness prong may afford petitioner relief. See *supra*, at 3–4. In other cases, a defendant can assert the doctrine of *forum non conveniens* if a given State is a highly inconvenient place to litigate a dispute. See *Gulf Oil Corp.* v. *Gilbert*, 330 U. S. 501, 508–509 (1947). In still other cases, the federal change of venue statute can provide protection. See 28 U. S. C. §1404(a) (permitting transfers to other districts "[f]or the convenience of parties and witnesses" and "in the interests of justice"). And to the degree that the majority worries these doctrines are not enough to protect the economic interests of multinational businesses (or that our longstanding approach to general jurisdiction poses "risks to international comity," *ante*, at 22), the task of weighing those policy concerns

belongs ultimately to legislators, who may amend state and federal long-arm statutes in accordance with the democratic process. Unfortunately, the majority short circuits that process by enshrining today's narrow rule of general jurisdiction as a matter of constitutional law.

C

The majority's concern for the consequences of its decision should have led it the other way, because the rule that it adopts will produce deep injustice in at least four respects.

First, the majority's approach unduly curtails the States' sovereign authority to adjudicate disputes against corporate defendants who have engaged in continuous and substantial business operations within their boundaries.[10] The majority does not dispute that a State can exercise general jurisdiction where a corporate defendant has its corporate headquarters, and hence its principal place of business within the State. Cf. *Hertz Corp.*, 559 U. S., at 93. Yet it never explains why the State should lose that power when, as is increasingly common, a corporation "divide[s] [its] command and coordinating functions among officers who work at several different locations." *Id.,* at 95–96. Suppose a company divides its management functions equally among three offices in different States, with one office nominally deemed the company's corporate headquarters. If the State where the headquarters is located can exercise general jurisdiction, why should the

---

[10] States will of course continue to exercise specific jurisdiction in many cases, but we have never held that to be the outer limit of the States' authority under the Due Process Clause. That is because the two forms of jurisdiction address different concerns. Whereas specific jurisdiction focuses on the relationship between a defendant's challenged conduct and the forum State, general jurisdiction focuses on the defendant's substantial presence in the State irrespective of the location of the challenged conduct.

other two States be constitutionally forbidden to do the same? Indeed, under the majority's approach, the result would be unchanged even if the company has substantial operations within the latter two States (and even if the company has no sales or other business operations in the first State). Put simply, the majority's rule defines the Due Process Clause so narrowly and arbitrarily as to contravene the States' sovereign prerogative to subject to judgment defendants who have manifested an unqualified "intention to benefit from and thus an intention to submit to the[ir] laws," *J. McIntyre*, 564 U. S., at \_\_\_ (plurality opinion) (slip op., at 5).

Second, the proportionality approach will treat small businesses unfairly in comparison to national and multinational conglomerates. Whereas a larger company will often be immunized from general jurisdiction in a State on account of its extensive contacts outside the forum, a small business will not be. For instance, the majority holds today that Daimler is not subject to general jurisdiction in California despite its multiple offices, continuous operations, and billions of dollars' worth of sales there. But imagine a small business that manufactures luxury vehicles principally targeting the California market and that has substantially all of its sales and operations in the State—even though those sales and operations may amount to one-thousandth of Daimler's. Under the majority's rule, that small business will be subject to suit in California on any cause of action involving any of its activities anywhere in the world, while its far more pervasive competitor, Daimler, will not be. That will be so even if the small business incorporates and sets up its headquarters elsewhere (as Daimler does), since the small business' California sales and operations would still predominate when "apprais[ed]" in proportion to its minimal "nationwide and worldwide" operations, *ante*, at 21, n. 20.

Third, the majority's approach creates the incongruous

result that an individual defendant whose only contact with a forum State is a one-time visit will be subject to general jurisdiction if served with process during that visit, *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604 (1990), but a large corporation that owns property, employs workers, and does billions of dollars' worth of business in the State will not be, simply because the corporation has similar contacts elsewhere (though the visiting individual surely does as well).

Finally, it should be obvious that the ultimate effect of the majority's approach will be to shift the risk of loss from multinational corporations to the individuals harmed by their actions. Under the majority's rule, for example, a parent whose child is maimed due to the negligence of a foreign hotel owned by a multinational conglomerate will be unable to hold the hotel to account in a single U. S. court, even if the hotel company has a massive presence in multiple States. See, *e.g., Meier* v. *Sun Int'l Hotels, Ltd.*, 288 F. 3d 1264 (CA11 2002).[11] Similarly, a U. S. business that enters into a contract in a foreign country to sell its products to a multinational company there may be unable to seek relief in any U. S. court if the multinational company breaches the contract, even if that company has considerable operations in numerous U. S. forums. See, *e.g., Walpex Trading Co.* v. *Yacimientos Petroliferos Fiscales Bolivianos*, 712 F. Supp. 383 (SDNY 1989).[12]

––––––––

[11] See also, *e.g.*, *Woods* v. *Nova Companies Belize Ltd.*, 739 So. 2d 617, 620–621 (Fla. App. 1999) (estate of decedent killed in an overseas plane crash permitted to sue responsible Belizean corporate defendant in Florida courts, rather than Belizean courts, based on defendant's continuous and systematic business contacts in Florida).

[12] The present case and the examples posited involve foreign corporate defendants, but the principle announced by the majority would apply equally to preclude general jurisdiction over a U. S. company that is incorporated and has its principal place of business in another U. S. State. Under the majority's rule, for example, a General Motors autoworker who retires to Florida would be unable to sue GM in that State

Indeed, the majority's approach would preclude the plaintiffs in these examples from seeking recourse anywhere in the United States even if no other judicial system was available to provide relief. I cannot agree with the majority's conclusion that the Due Process Clause requires these results.

\* \* \*

The Court rules against respondents today on a ground that no court has considered in the history of this case, that this Court did not grant certiorari to decide, and that Daimler raised only in a footnote of its brief. In doing so, the Court adopts a new rule of constitutional law that is unmoored from decades of precedent. Because I would reverse the Ninth Circuit's decision on the narrower ground that the exercise of jurisdiction over Daimler would be unreasonable in any event, I respectfully concur in the judgment only.

———————

for disabilities that develop from the retiree's labor at a Michigan parts plant, even though GM undertakes considerable business operations in Florida. See Twitchell, The Myth of General Jurisdiction, 101 Harv. L. Rev. 610, 670 (1988).